AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

AUG 07 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| In the Matter of the Search of | ) |
| --- | --- |
| | ) |
| 2138 Lonnie Beck Way, Stockton, California | ) |
| | ) |
| | ) |

Case No.

2:17 - SW - 0710 --- EFB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-3, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

**SEALED**

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 846 | Conspiracy to Distribute at Least 50 Grams of Actual Methamphetamine |
| 21 U.S.C. § 841(a)(1) | Distribution of at Least 50 Grams of Actual Methamphetamine |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David A. Klingman
Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _8 - 7 - 2017_

_____
*Judge's signature*

City and state: Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

**Attachment A-3**

**2138 Lonnie Beck Way, Stockton, California**

2138 Lonnie Beck Way, Stockton, California is a two-story residence located on the southeast corner of the intersection of Lonnie Beck Way and Spring Creek Place in Stockton, California. A photograph of the home's exterior is pasted below.

The residence is cream-colored stucco. A shrub brush line sits to the west of the residence, along Spring Creek Place. The residence has a dark-colored front door, which faces north. The black-colored numbers "2138" are displayed on the west side of a large garage door. The rear of the property is surrounded by a fence.

The search of this location shall include ANY AND ALL attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

This warrant also pertains to any vehicles located in the garage of 2138 Lonnie Beck Way.



**ATTACHMENT B**

**ITEMS TO BE SEARCHED FOR AND SEIZED FROM THE PREMISES AND FROM ANY CLOSED ITEMS AND CONTAINERS FOUND THEREIN**

Agents are authorized to search and seize property that constitutes evidence, fruits, proceeds, and instrumentalities of violations of the following federal statutes (the "Target Offense") believed to have been committed by Daniel Barraza-Bazua:

   a.  21 U.S.C. § 846 – Conspiracy to Distribute and to Possess with Intent to Distribute More than 50 Grams of Actual Methamphetamine

   b.  21 U.S.C. § 841(a)(1) – Distribution of More than 50 Grams of Actual Methamphetamine

As further described in the affidavit, the specific evidence, fruits, proceeds and instrumentalities of the Target Offenses for which agents may search includes:

   1.  Any methamphetamine, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

   2.  United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

   3.  Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from heroin or methamphetamine distribution and the transfer, investment, control and disposition of those proceeds;

   4.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

   5.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

6.      Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.      Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.      Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9.      Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.     Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11.     Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12.     Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

# AFFIDAVIT OF DEA SPECIAL AGENT DAVID KLINGMAN IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANT & SEARCH WARRANTS

I, Drug Enforcement Administration Special Agent David A. Klingman, being duly sworn, hereby state:

## SCOPE OF REQUESTED CRIMINAL COMPLAINT & ARREST WARRANT

1.    This affidavit is submitted in support of an arrest warrant and criminal complaint charging Daniel BARRAZA-BAZUA with:

COUNT ONE – Beginning in about October 2016 and continuing through on or about August 1, 2017: Knowingly and intentionally conspiring and agreeing with at least one other person to distribute and to possess with intent to distribute at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 U.S.C. §§ 846 and 841(a)(1).

COUNT TWO – On or about November 7, 2016: Distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

COUNT THREE – On or about December 5, 2016: Distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

COUNT FOUR – On or about January 31, 2017: Distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

COUNT FIVE – On or about April 14, 2017: Distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

COUNT SIX – On or about August 1, 2017: Distributing at least 50 grams of actual methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

## SCOPE OF REQUESTED SEARCH WARRANTS

2.    This affidavit also supports applications for warrants to search locations further described in **Attachments A-1** through **A-7**.  The contraband, objects, and information for which we

will search are described in **Attachment B**.  Attachments A-1 through A-7 and Attachment B are incorporated by reference.

3.     We request authority to search in seven locations:

   a.     **170 West Ninth Street**, Stockton, California, a residence more fully described in **Attachment A-1**.

   b.     **102 West Sixth Street**, Stockton, California, a residence more fully described in **Attachment A-2**.

   c.     **2138 Lonnie Beck Way**, Stockton, California, a residence more fully described in **Attachment A-3**.

   d.     **Trailer #1**: A pull-behind camper trailer, more fully described in **Attachment A-4**.

   e.     **White GMC**:  A white GMC truck bearing California license plate number 09428T1 and more fully described in **Attachment A-5**.

   f.     **White Dakota**:  A white Dodge Dakota bearing California license plate number 76310R1 and more fully described in **Attachment A-6**.

   g.     **Red Honda**:  A red Honda Accord bearing California license plate number 7YOV622 and more fully described in **Attachment A-7**.

4.     I am currently conducting an investigation of a conspiracy to distribute methamphetamine and to possess methamphetamine with the intent to distribute it.  The investigation involves defendant Daniel BARRAZA-BAZUA and others in the Eastern District of California. The facts and information set forth in this Affidavit are based upon my personal knowledge obtained during this investigation and other documents and records obtained during this investigation.  Because I submit this Affidavit for the limited purpose of setting forth probable cause for the requested search warrants, arrest warrant, and criminal complaint, I have not included every fact known to me concerning this investigation.  I have only included what I believe are adequate facts to establish probable cause that Daniel BARRAZA-BAZUA has committed violations of Title 21, United States Code, Sections 841(a)(1) and 846, and that evidence of these violations will be found in the locations to be searched.  However, I have not intentionally omitted any fact material to this Court's determination of probable cause to search the locations identified in Attachments A-1 through A-9.

5.     In addition, where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part.  Similarly, where I describe information contained in reports and other documents or records in this affidavit, this information is also described in sum, substance, and relevant part.

## BACKGROUND AND EXPERTISE

6.  I am a special agent of the United States Department of Justice, Drug Enforcement
    Administration ("DEA"). I have been a DEA special agent since December 2004. I am
    currently assigned to the DEA Sacramento District Office charged with investigating major
    drug trafficking organizations operating in the Eastern District of California. From 2000 to
    December 2004, I was a police officer for the City of Chardon, Ohio.

7.  As a DEA agent, I have assisted in the execution of search warrants on many occasions for
    controlled substances and/or related paraphernalia, indicia, and other evidence of violations
    of federal drug statutes. I have participated in investigations targeting individuals and
    organizations trafficking cocaine, heroin, marijuana, and methamphetamine.

8.  During the course of my career as a DEA special agent, I have participated in multiple drug
    investigations. Through my training, experience, and interaction with other experienced
    special agents, task force agents, and other drug investigators, I have become familiar with
    the methods employed by drug traffickers to smuggle, safeguard, store, transport, and
    distribute drugs; to collect and conceal drug related proceeds; and to communicate with
    other participants to accomplish such objectives. I have received specialized training in
    narcotic investigation matters including, but not limited to, drug interdiction, drug
    detection, money laundering techniques and schemes, drug identification, and asset
    identification and removal, from the DEA.

9.  During the course of these investigations, I have become familiar with the manner in which
    drug traffickers use telephones, often cellular telephones, to conduct their illegal
    operations. I have participated in at least five separate wire interception cases,
    encompassing at least ten telephones. I have previously written at least five wire
    interception affidavits. Furthermore, I have served as both a monitor and wire room
    supervisor on at least five federal wiretap investigations.

10. Through my training, experience, and interaction with other experienced Special Agents,
    Task Force Agents, and other drug investigators, I have become familiar with the methods
    employed by drug traffickers to smuggle, safeguard, store, transport, distribute drugs, to
    collect and conceal drug related proceeds, and to communicate with other participants to
    accomplish such objectives. These methods include the use of telephones, pre-paid or debit
    calling cards, public telephones, wireless communications technology such as paging
    devices and cellular telephones, counter-surveillance, elaborately planned smuggling
    schemes tied to legitimate businesses, and use of codes in communications in an attempt to
    avoid detection by law enforcement. Based on my training and experience, I also know
    that violators of the controlled substances laws often purchase telephones or subscribe to

3

telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

11. In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (2) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data and pen register data; (3) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (4) a review of public records, telephone toll records, and subscriber information; (5) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (6) a review of driver's license and automobile registration records; (7) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (8) my training and experience as a DEA agent and; (9) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

12. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516

13. The facts and information set forth herein are true based upon my personal knowledge and observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me, my review of investigative reports, notes, transcripts, review of intercepted communications, and discussions with other federal, state and local law enforcement officials. Because this affidavit is submitted for the limited purpose of supporting a criminal complaint and securing the requested arrest and search warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the individuals named herein, a criminal complaint charging the individuals named herein, and the search and seizure of the properties identified in this affidavit.

//

//

## STATEMENT OF PROBABLE CAUSE

### *Summary of Investigation*

14. Since October 2016 , the DEA Sacramento District Office ("SDO"), the San Joaquin Metropolitan Narcotics Task Force ("METRO"), and the Tri-County Drug Enforcement Team ("TRIDENT") – collectively referred to as the "Investigating Agencies" – have been conducting a criminal investigation of Daniel BARRAZA-BAZUA, hereinafter referred to as BARRAZA.  The investigation has also focused on BARRAZA's associates operating in Stockton, California.  These associates include Jesus Romualdo BERNAL URENA.

15. During this investigation, a DEA Confidential Source ("CS") has conducted several controlled purchases of methamphetamine from BARRAZA.  During these controlled purchases, agents have used several investigative techniques – including surveillance, toll analysis, wire intercepts, and GPS location information – in their attempt to identify BARRAZA's associates, drug stash locations, and the destination of drug-related payments.

16. These techniques have allowed the Investigating Agencies to identify Stockton addresses **170 West Ninth Street** and **102 West Sixth Street** as locations that BARRAZA uses in connection with his drug trafficking activities.  BARRAZA has also used a **white GMC** truck and a **red Honda** to help facilitate his drug trafficking activities.

17. These techniques have also allowed the Investigating Agencies to identify Jesus Romualdo BERNAL URENA as a likely courier and as BARRAZA's suspected methamphetamine source of supply.  I believe that BERNAL URENA stores drugs in **Trailer #1**, located on North Windsor Road in Stockton, California.  I further believe that BERNAL URENA lives at **2138 Lonnie Beck Way** in Stockton, California, that he drives the **white Dakota** truck, and that he uses these locations to facilitate drug trafficking, as well.

### *Initial Information on BARRAZA's Drug Trafficking Activities*

18. An agent obtained information from a confidential source ("CS") about  BARRAZA's drug trafficking activities

19. The CS is cooperating with law enforcement because s/he hopes to receive consideration for anticipated state criminal charges.  The CS has a felony criminal history including convictions relating to drug distribution and firearms.  The CS has personal knowledge of BARRAZA's drug trafficking activities.  Agents have been able to corroborate some CS

information relating to BARRAZA'S drug trafficking. I believe the CS's information relating to this investigation is reliable.

20.    In October 2016, the CS received a non-recorded incoming telephone call from a Stockton area code telephone number. The Investigating Agencies later identified the caller as BARRAZA.[1] He told the CS that a third party had asked him to call the CS because the CS was looking for "work," a code word for controlled substances. The CS and BARRAZA agreed to continue their discussion in person.

21.    The next day, as directed by the Investigating Agencies, the CS met BARRAZA in Stockton, California. During the non-recorded meeting, BARRAZA agreed to sell the CS methamphetamine for $2,600.00 per pound. He also provided the CS with telephone number 209-993-7257. BARRAZA instructed the CS to use code words such as motor and/or engine when referring to methamphetamine on the telephone. BARRAZA also told the CS to call if the CS needed anything, referring to methamphetamine. During later meetings, BARRAZA also offered to sell the CS heroin and cocaine.

### _November 7, 2016: Controlled Purchase of Methamphetamine from BARRAZA_

22.    On October 31, 2016, at the direction of law enforcement, the CS placed a recorded call to BARRAZA at telephone number 209-993-7257 and arranged to purchase two pounds of methamphetamine on November 7, 2016.

23.    On November 7, 2016, the CS placed a recorded telephone call to BARRAZA. The two agreed to meet in a gas station parking lot in Stockton, California. Agents provided the CS with $5,200 in prerecorded funds and a transmitter/recording device. Before and after the meeting, the CS and his/her vehicle were searched for money, drugs, and weapons. Each search produced negative results.

24.    On November 7, 2016, surveillance saw a man exit his residence at **170 West Ninth Street, Stockton, California.** Using BARRAZA's California Department of Motor Vehicles photograph, surveillance positively identified this man as BARRAZA.

25.    When BARRAZA left his residence, he was carrying an unknown white item, which he placed in the back of his **white GMC** truck. Then, surveillance followed BARRAZA to **102 West Sixth Street**, where he retrieved the item from the back of his truck and then entered the property. Later, before BARRAZA left again in the **white GMC**, surveillance saw him place the item in the bushes. Surveillance agents then observed BARRAZA travel to meet with the CS at their agreed location.

---

[1] _See_ Paragraphs 24, 30.

26. When BARRAZA and the CS met at the gas station, BARRAZA instructed the CS to follow him to another location. The CS agreed and followed in his/her own car to **102 West Sixth Street**, Stockton, California, which BARRAZA said belonged to a family member. Surveillance kept the CS and BARRAZA under observation as the CS followed BARRAZA to the residence. BARRAZA said that any future transactions would occur at this residence. Surveillance observed BARRAZA retrieve the white item from the bushes and then provide it to the CS. The CS handed the prerecorded money to BARRAZA.

27. Shortly after the CS left **102 West Sixth Street**, surveillance followed BARRAZA in the **white GMC** back to **170 West Ninth Street**. There, BARRAZA got out of the **white GMC** truck, approached the front of the residence, and went out of view.

28. Following the meeting with BARRAZA at **102 West Sixth Street**, agents followed the CS directly back to a pre-determined neutral location. There, the CS provided agents with a white gift bag holding two clear Betty Crocker containers. During a debriefing later that day, the CS said the white gift bag contained suspected methamphetamine.

29. Agents field tested the substance in the Betty Crocker containers and obtained a positive result for the presence of methamphetamine. The substance weighed approximately 1065.5 gross grams. The suspected methamphetamine was later sent to the Western Regional Laboratory for analysis and the lab results are pending.

30. After viewing BARRAZA's California Driver's License photo, the CS confirmed s/he had purchased the suspected methamphetamine from BARRAZA.

### *December 5, 2016: Controlled Purchase of Methamphetamine from BARRAZA*

31. On December 5, 2016, law enforcement directed the CS to place a recorded telephone call to BARRAZA at telephone number 209-993-7257 and to arrange for the purchase of two pounds of methamphetamine later that day. BARRAZA agreed.

32. Agents provided the CS with $5,200 of prerecorded funds and a transmitter/recording device. Before and after the meeting, the CS and CS's vehicle were searched for money, drugs, and weapons. Each search produced with negative results.

33. Agents established surveillance at **102 West Sixth Street** and **170 West Ninth Street**. At about 4:30 p.m., surveillance positively identified BARRAZA leaving **170 West Ninth Street** in the **white GMC** and arriving at **102 West Sixth Street**. Agents also followed the CS directly to the **102 West Sixth Street**, where the CS met BARRAZA.

34. BARRAZA and the CS talked for about 45 minutes until a white truck, later identified as the **white Dakota,** arrived at **102 West Sixth Street**. When the **white Dakota** arrived, the CS sent agents a message stating "his boy just showed up," "that is why the wait." The CS was indicating that the person in the **white Dakota** was delivering the methamphetamine. Surveillance saw the driver and sole occupant of the **white Dakota** place an item in the bed of the **white GMC** truck before departing. Then, BARRAZA told the CS that "the stuff", meaning methamphetamine, was in BARRAZA's truck. BARRAZA retrieved a bag from the back of the **white GMC** truck and handed it to the CS. The CS handed the prerecorded money to BARRAZA.

35. Surveillance followed the **white Dakota** as it went to two more residences and then a grocery store before arriving at **Trailer #1**. **Trailer #1** and Trailer #2 are accessed from a driveway located on North Windsor Avenue, Stockton, California. **Trailer #1** and Trailer #2 sit about 30 feet from each other and in the southeast corner of parcel #1434003, which contains several separate residential structures and trailers. Surveillance agents saw the driver of the **white Dakota** get out of the **white Dakota** and enter **Trailer #1**. They could not positively identify the driver partly because they were observing after dark. The surveillance agents waited a short time and then left.

36. Following the CS's meeting with BARRAZA at **102 West Sixth Street**, agents followed the CS directly back to a neutral location. There, agents obtained two clear Betty Crocker containers from the CS. Their contents later tested positive for methamphetamine and weighed approximately 1063.6 gross grams. Agents later sent the suspected methamphetamine to the Western Regional Laboratory for analysis. Results are pending.

### *January 31, 2017: Controlled Purchase of Methamphetamine from BARRAZA*

37. On January 31, 2017, agents established surveillance at **102 West Sixth Street** and **170 West Ninth Street**.

38. Law enforcement directed the CS to place a recorded telephone call to BARRAZA at telephone number 209-993-7257 and to arrange for the purchase of two pounds of methamphetamine later that day. BARRAZA said he was busy but would call the CS back.

39. About 90 minutes later, BARRAZA called the CS and said he was ready. At the same time, the **white GMC** truck arrived at **102 West Sixth Street**, and surveillance saw BARRAZA and two other men get out of the truck. BARRAZA and the other two men appeared to work on a truck parked at the residence.

8

40. Agents provided the CS with $5,200 in prerecorded funds and a transmitter/recording device. In addition, before and after the meeting, agents searched the CS and CS's vehicle for money, drugs, and weapons. Each search produced negative results.

41. Agents followed the CS directly to **102 West Sixth Street**, where the CS met BARRAZA. When the CS arrived, s/he met BARRAZA inside the yard of **102 West Sixth Street** and had a brief conversation with him. During this conversation, BARRAZA pulled a black plastic bag from under his jacket and placed it on a nearby garbage can. The CS handed BARRAZA $5,200 and picked up the black plastic bag. The CS confirmed that it was the methamphetamine that s/he had ordered.

42. The CS left **102 West Sixth Street**, and agents followed him/her directly to a pre-determined neutral location. There, the CS gave the agents a black bag containing two clear plastic containers. Their contents later tested positive for methamphetamine and weighed approximately 1062.4 gross grams. Agents later sent the suspected methamphetamine to the Western Regional Laboratory for analysis. Results are pending.

43. After the CS left **102 West Sixth Street**, surveillance followed BARRAZA as he drove the **white GMC**. He briefly stopped at another residence but never went inside or met with anyone. Then, BARRAZA drove the **white GMC** to **170 West Ninth Street**, where he got out of the truck and entered the front door of the residence.

### *February 2, 2017: Traffic Stop of the White Dakota*

44. Using investigative techniques, agents located the **white Dakota** parked at **2138 Lonnie Beck Way** in Stockton, California.

45. On February 2, 2017, agents established surveillance at **2138 Lonnie Beck Way** and saw the **white Dakota** backed into the driveway. A short time later, agents saw two Hispanic men leave **2138 Lonnie Beck Way** in the **white Dakota**.

46. A San Joaquin County Sheriff's Deputy saw that the **white Dakota** had a non-functioning rear taillight and a non-functioning stop light, violations of California Vehicle Codes 24600 (E) and 24603 (B), so the deputy initiated a traffic stop. The driver presented a California driver's license in the name of Jesus Romualdo BERNAL URENA, and the passenger presented a Mexican Consular card identifying him as Fernando LOPEZ-JIMENEZ. The deputy cited BERNAL URENA for the above violations and released him.

//

### *April 14, 2017: Controlled Purchase of Methamphetamine from BARRAZA*

47. On April 14, 2017, law enforcement directed the CS to place a recorded telephone call to BARRAZA at number 209-993-7257 and to arrange for the purchase of two pounds of methamphetamine later that day. The CS did so, and BARRAZA provided the CS with directions to where BARRAZA was installing a fence.

48. Before and after the meeting, the CS and CS's vehicle were searched for money, drugs, and weapons. Each search produced negative results. In addition, agents provided the CS with $5,600 of prerecorded funds and a transmitter/recording device.

49. On April 14, 2017, law enforcement established surveillance at **102 West Sixth Street**.

50. Surveillance agents watching **102 West Sixth Street** observed the **white Dakota** arrive and park along the curb next to the residence. The **white Dakota's** driver got out of the truck and walked to the fence surrounding the rear yard of **102 West Sixth Street.** An agent saw the **white Dakota's** driver – who has not yet been positively identified – reach over the fence, then return to the **white Dakota**, and drive off. The **white Dakota** and its driver were at **102 West Sixth Street** for less than two minutes.

51. Surveillance located BARRAZA based on BARRAZA's directions to the CS. The CS arrived at the provided location, and BARRAZA got into the CS's vehicle. Surveillance followed the CS and BARRAZA as they drove directly to **102 West Sixth Street**. BARRAZA and the CS arrived at **102 West Sixth Street** minutes after the **white Dakota** had left. There, surveillance saw BARRAZA enter the property through a gate leading to a detached garage. A few minutes later, BARRAZA approached the CS's vehicle carrying a white, plastic, grocery bag and gave the CS the bag. He then returned to secure the gate. Surveillance followed the CS and BARRAZA directly back to the jobsite location, where the CS dropped BARRAZA off.

52. Agents followed the CS directly back to a neutral location, where the CS gave agents a white, plastic grocery bag containing two clear zip lock bags. Their contents later tested positive for methamphetamine and weighed about 936 gross grams. The suspected methamphetamine was later sent to the Western Regional Laboratory for analysis. The lab results showed methamphetamine purity of 98 percent and 869.2 grams of pure substance.

//

//

### *August 1, 2017: Controlled Purchase of Methamphetamine from BARRAZA*

53. On August 1, 2017, law enforcement established surveillance at **170 West Ninth Street**, **102 West Sixth Street**, and **2138 Lonnie Beck Way**. Agents observed the **white Dakota** parked on the street at **2138 Lonnie Beck Way**.

54. On the same date, law enforcement directed the CS to place a recorded telephone call to BARRAZA at telephone number 209-993-7257. During the call, BARRAZA told the CS that BARRAZA was home resting. The CS and BARRAZA agreed to meet at **102 West Sixth Street** in fifteen minutes. Shortly after the telephone call, surveillance saw BARRAZA drive the **red Honda** from **170 West Ninth Street** to **102 West Sixth Street**.

55. Agents provided the CS with $5,600 of prerecorded funds and a transmitter/recording device.

56. Agents followed the CS directly to **102 West Sixth Street**, where the CS met with BARRAZA. During this meeting, the CS told BARRAZA that s/he wanted to purchase two pounds of methamphetamine, and then BARRAZA made a telephone call. After ending the telephone call at about 5:45 p.m., BARRAZA told the CS it would be an hour or an hour and a half before the methamphetamine would be ready. BARRAZA said he would call the CS when BARRAZA was ready.

57. Agents followed the CS as he left from **102 West Sixth Street** and went to a neutral location. Minutes later, BARRAZA drove from **102 West Sixth Street** to **170 West Ninth Street**. In doing so, he conducted counter-surveillance techniques – including driving very slowly, taking an indirect route, and randomly pulling over to the side of the street before arriving at **170 West Ninth Street**. Upon his arrival, BARRAZA entered the front yard and sat down in a chair.

58. At about 6:09 p.m., surveillance saw BERNAL URENA drive the **white Dakota** away from **2138 Lonnie Beck**. The **white Dakota** carried an unknown Hispanic male passenger, hereinafter referred to as UM#1.

59. Surveillance followed the **white Dakota** from **2138 Lonnie Beck Way** to the driveway located on North Windsor Avenue, Stockton, California. Agents saw the **white Dakota** arrive and drive toward the rear of the property, where **Trailer #1** and Trailer #2 are located. Agents were unable to follow without being detected. About six minutes later, the **white Dakota** left the parcel. Surveillance followed it directly to **102 West Sixth Street**, where it arrived at about 6:33 p.m. Surveillance units at **102 West Sixth Street** confirmed that BERNAL URENA and UM#1 were the only occupants of the **white Dakota**.

60. While driving from North Windsor Avenue to **102 West Sixth Street**, the **white Dakota** drove directly past **170 West Ninth Street**. BARRAZA was sitting in the front yard as the **white Dakota** passed the house. Within two minutes, surveillance saw BARRAZA leave **170 West Ninth Street** in the **white GMC** and drive to **102 West Sixth Street.**

61. Agents saw BARRAZA, BERNAL URENA, and UM#1 enter the property at **102 West Sixth Street**. A few minutes later, UM#1 walked out onto the sidewalk and appeared to look up and down the street. At about 6:43 p.m., BERNAL URENA and UM#1 left in the **white Dakota**. During the previous hour, agents had not seen any other vehicles or people visit **102 West Sixth Street.**

62. Also at about 6:43 p.m. – the same time the Dakota left and almost exactly one hour since BARAZZA placed the methamphetamine order, BARRAZA called the CS. The CS said that BARRAZA used coded language indicating that BARRAZA had the two pounds of methamphetamine and was ready to meet.

63. Agents followed the CS directly to **102 West Sixth Street**, where the CS entered the property and met with BARRAZA. About ten minutes later, agents saw the CS carrying a white bag from **102 West Sixth Street** to the CS's vehicle.

64. Agents followed the CS as he drove directly to a neutral location. There, agents saw a white bag on the CS's passenger floor. It held two plastic containers of a clear crystal substance. The CS indicated that s/he had purchased these containers of crystal substance from BARRAZA. The clear crystal substance field tested positive for the presence of methamphetamine and had a gross weight of 1057.5 grams.

65. Before and after each meeting on August 1, 2017, the CS and CS's vehicle were searched for unexplained money, drugs, and weapons. Each search produced negative results.

66. Surveillance followed the **white Dakota** from **102 West Sixth Street** to a liquor store, a grocery store, and then to **Trailer #1**. Surveillance saw the **white Dakota** park on the east side of **Trailer #1**. Surveillance saw BERNAL URENA get out of the **white Dakota** and enter **Trailer #1**.

67. About 30 feet separate **Trailer #1** and Trailer #2. The parcel on which they sit has several homes with addresses posted on them. However, **Trailer #1** and Trailer #2 have no posted addresses of which I am aware. An agent who visited **Trailer #1** and Trailer #2 last week saw nothing – such as laundry or garbage cans – to indicate that people were currently living in the trailers or in a camper that sits between them. In my inspection of photos, I

could not identify an external generator that would provide power to **Trailer #1** or to Trailer #2.

68.    Surveillance saw UM#1 carry what appeared to be two white weighted bags into Trailer #2. The bags appeared to be white, plastic bags similar to those one would receive at a grocery or convenience store. They also seemed to be similar to the white plastic bag that contained the methamphetamine the CS purchased from BARRAZA on April 14, 2017. UM#1 exited Trailer #2 without the white plastic bags. Then, BERNAL URENA exited **Trailer #1** and entered Trailer #2. A short time later, BERNAL URENA exited Trailer #2. Agents saw UM#1 and two other unknown men get inside a silver Ford Escape bearing California license plate number 7YHF389 ("the silver Escape"). The silver Escape was parked near Trailer #2. Surveillance followed the silver Escape directly back to **2138 Lonnie Beck Way**, Stockton, California, where all three vehicle occupants entered the front door of the residence.

69.    About one hour after the silver Escape left Trailer #2, surveillance saw the **white Dakota** leave the area, too. Surveillance followed the **white Dakota** and saw what agents believed to be counter surveillance measures – such as squaring the block and driving slowly – before it arrived at a residence for a short period of time.

70.    After agents saw the **white Dakota** depart from the residence, a San Joaquin County sheriff's deputy saw the **white Dakota** violate California Vehicle Code 22450(a), which is a stop sign violation. The deputy initiated a traffic stop on the **white Dakota**. The driver used a California driver's license to identify himself as Jesus Romualdo BERNAL URENA. BERNAL URENA told the officer that he lived at **2138 Lonnie Beck Way** and that he was headed to the **Lonnie Beck** address. The deputy cited BERNAL URENA for the violation and terminated the traffic stop. Surveillance followed the **white Dakota** directly to **2138 Lonnie Beck Way**, where BERNAL URENA entered the residence through the front door.

71.    Based on my training and experience, I believe that BERNAL URENA is a likely courier and methamphetamine supplier for BARRAZA. I know that it is common for drug traffickers to store drugs, packing materials, and drug-related paraphernalia in locations that are not their residences. Moreover, it is common for drug traffickers to attempt to isolate their criminal activity at these alternate locations. This allows them to compartmentalize it from their residential lives and makes law enforcement surveillance more difficult. I believe that BERNAL URENA lives at **2138 Lonnie Beck Way** but utilizes **Trailer #1** to store controlled substances and prepare them for distribution. Furthermore, I believe that BERNAL URENA is utilizing the **white Dakota** to facilitate his drug trafficking activities.

### *Further Information about 170 West Ninth Street*

72. A search of records from the California Department of Motor Vehicles shows that BARRAZA's California driver's license lists **170 West Ninth Street**, Stockton, California, as his residential address. In addition, the telephone number used by BARRAZA – 209-993-7257 – is subscribed to Natalie BARRAZA at **170 West Ninth Street**, Stockton, California.

### *Further Information about 102 West Sixth Street and the Red Honda*

73. The **red Honda** that BARRAZA drove on August 1, 2017, and that agents have seen parked in front of **170 West Ninth Street** is registered to Martin Barraza at **102 West Sixth Street**, Stockton, California. I believe Martin Barraza is BARRAZA's family member.

### *Further Information about 2138 Lonnie Beck Way*

74. BERNAL URENA told law enforcement that his residence was **2138 Lonnie Beck Way**. Based on their observations of UM#1 on August 1, 2017, and on their observations of the silver Escape, agents believe UM#1 may also live at **2138 Lonnie Beck Way.**

75. On multiple occasions and as recently as August 1, 2017, agents have seen the silver Escape parked at **2138 Lonnie Beck Way**.

76. A check of California Department of Motor Vehicles records shows the silver Escape was last registered to Raquel Barraza at **2138 Lonnie Beck Way**. The records also showed a release of liability to Miguel Torres at 1457 S California Street, Stockton, California. An agent verified that 1457 S California Street is not an actual address in Stockton, California. I know through my training and experience that vehicles used by drug traffickers are often registered using fake names and addresses or in the names of nominees in an effort to avoid detection by law enforcement.

### *Further Information about the White GMC*

77. A search California Department of Motor Vehicles records shows that the **white GMC** is registered to Maria Delcarmen at 1347 S California Street, Stockton, California. I believe that a business associated with BARRAZA's family operates at this address.

### *Further Information about the White Dakota*

78. A search California Department of Motor Vehicles records shows that the **white Dakota** is registered to Gregorio Santillan at 1347 S California Street, Stockton, California. I believe that a business associated with BARRAZA's family operates at this address.

### *Summary of Evidence Related to Search Locations*

79. The residence located at **170 West Ninth Street**, Stockton, California and more fully described in **Attachment A-1**:
    a. BARRAZA's driver's license lists this as his residential address;
    b. Agents have seen BARRAZA at this address on several occasions;
    c. BARRAZA was at this address when he told the CS on August 1, 2017, that he was home resting;
    d. I have probable cause to believe BARRAZA was carrying methamphetamine when he left this residence on November 7, 2016.

80. The residence located at **102 West Sixth Street**, Stockton, California, and more fully described in **Attachment A-2**:
    a. All controlled transactions have occurred at this property;
    b. BARRAZA said all drug purchases would occur at the property;
    c. BARRAZA said the property was owned by a family member;
    d. The red Honda is registered to this address.

81. The residence located at **2138 Lonnie Beck Way**, Stockton, California, and more fully described in **Attachment A-3**:
    a. BERNAL URENA told law enforcement that this residence was his home;
    b. The white Dakota was parked here on February 2, 2017, and on August 1, 2017;
    c. The silver escape driven by UM#1 is registered to this address;
    d. Within about 30 minutes of BARRAZA's placing a methamphetamine order on August 1, 2017, BERNAL URENA and UM#1 left from this residence in the white Dakota;
    e. I have probable cause to believe that BERNAL URENA and UM#1 made a methamphetamine delivery to 102 West Sixth Street on August 1, 2017 and that, after they did so, they ultimately returned to this address in separate cars.

82. **Trailer #1**, a pull-behind camper trailer, more fully described in **Attachment A-4**:
    a. Trailer #1 is in an isolated location and appears to be uninhabited;

b. I have probable cause to believe that, on December 5, 2016, the driver of the white Dakota completed a methamphetamine delivery to 102 West Sixth Street and then – after traveling to two other residences and a grocery store – went to this trailer;

c. I have probable cause to believe that, on August 1, 2017, BERNAL URENA and UM#1 went to the area of this trailer in order to obtain methamphetamine for a delivery; immediately afterward, they traveled to 102 West Sixth Street; as they left, BARRAZA called the CS to say the methamphetamine order was ready;

d. After leaving 102 West Sixth Street on August 1, 2017, BERNAL URENA and UM#1 returned to the area of Trailer #1, and BERNAL URENA entered the trailer.

83. The **white GMC** truck bearing California license plate number 09428T1 and more fully described in **Attachment A-5**:

   a. This truck is registered to a business that I believe is associated with BARRAZA's family;

   b. BARRAZA drove this vehicle to various methamphetamine transactions;

   c. I have probable cause to believe BARRAZA carried methamphetamine in this truck on November 7, 2016;

   d. I have probable cause to believe that, on December 5, 2016, the back of the white GMC carried methamphetamine, which BARRAZA retrieved and sold to the CS.

84. The **white Dakota**, a Dodge truck bearing California license plate number 76310R1 and more fully described in **Attachment A-6**:

   a. This truck is registered to a business that I believe is associated with BARRAZA's family;

   b. BERNAL URENA drove the white Dakota on February 2, 2017 and on August 1, 2017;

   c. There is probable cause to believe that, on December 5, 2016, this vehicle delivered the methamphetamine that the CS purchased nearly immediately;

   d. There is probable cause to believe that, on April 14, 2017, this vehicle delivered the methamphetamine that the CS purchased that day;

   e. There is probable cause to believe that, on August 1, 2017, this vehicle delivered the methamphetamine that the CS purchased that day.

85. The **red Honda** Accord bearing California license plate number 7YOV622 and more fully described in **Attachment A-7**:

   a. The red Honda is registered to 102 West Sixth Street, the address at which all controlled purchases have occurred;

   b. BARRAZA drove this car from his home to 102 West Sixth Street on August 1, 2017.

### *Conclusion*

86.   Based on the above information, I believe there is probable cause to believe that
      BARRAZA has committed violations of 21 U.S.C. §§ 841(a)(1) and 846.

87.   I believe that BARRAZA resides at **170 West Ninth Street**, Stockton, California and uses
      **102 West Sixth Street**, Stockton, California, to further his drug trafficking activities.  I
      also believe BARRAZA uses the **white GMC** and the **red Honda** to facilitate his drug
      trafficking activities.  I believe each of these locations may contain evidence of the
      conspiracy and of methamphetamine distribution – based on my training and experience,
      on BARRAZA's sale of large quantities of methamphetamine, on surveillance of meetings
      between BARRAZA and the CS, and on other surveillance of these locations.

88.   Furthermore, based on my training and experience, surveillance of meetings between
      BARRAZA and BERNAL URENA, and surveillance of activities at **2138 Lonnie Beck
      Way**, at **Trailer #1**, and of the **white Dakota**, I believe evidence of the conspiracy and of
      methamphetamine distribution may be found within **2138 Lonnie Beck Way, Trailer #1**,
      and the **white Dakota**.

### AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

89.   Based on my training and experience and on consultations with other federal, state and
      local law enforcement personnel, I believe the following to be true:

90.   Persons involved in the distribution of controlled substances often maintain at their
      residences, outbuildings, secondary residences, businesses, and vehicles, quantities of
      controlled substances, as well as paraphernalia for manufacturing, use, packaging, and
      distribution of controlled substances.  Drug traffickers also maintain records relating to
      their trafficking activities in these same places.  These records include personal calendars,
      address/telephone books, and papers reflecting the names, addresses, pager, telephone, and
      fax numbers relating to their drug trafficking associates.  These records can be in written
      form.  Drug traffickers also keep stored messages and telephone numbers relating to their
      trafficking activities within electronic devices.  Further, drug traffickers often keep
      photographs and audio/video recordings depicting themselves and their associates, as well
      as their assets and controlled substances.  They may also keep electronic equipment used
      for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

91.   Premises and vehicles used by individuals involved in drug dealing usually contain articles
      of personal property showing the identity of persons occupying, possessing, residing in,
      owning, frequenting or controlling the premise or property.

92. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

93. Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

94. Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets (S); (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; (d) Using money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

95. Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities. These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records. Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide

large amounts of currency, and that evidence of such will be located at the described locations.

96. Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

97. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions. These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in the Attachment B attached to each of the locations requested.

98. Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences. Therefore I am requesting permission to search all outbuildings located at each of the locations requested.

99. Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

100. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

101. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use

19

accounts to complete financial statements and tax returns for their business and personal returns.

102.   Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

103.   Persons engaged in illegal activities and/or money laundering often maintains such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.  Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time.  In addition, based on *United States v. Angulo-Lopez*, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

104.   There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence.

105.   Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence or place of business.

106.   The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored.

## **REQUEST TO SEAL**

107. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search and arrest warrants and an inventory of any items seized that will be left at the locations of the execution of the search warrants.

I hereby request that a criminal complaint and arrest warrant be issued for BARRAZA.

I also hereby request that search warrants be issued for the locations described in Attachments A-1 through A-7.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

DAVID A. KLINGMAN
DEA Special Agent

Sworn and Subscribed to me on August 7, 2017

Hon. Edmund F. Brennan
United States Magistrate Judge

Approved as to form:

Amanda Beck
Assistant United States Attorney

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

In the Matter of the Search of )
)
) Case No.
2138 Lonnie Beck Way, Stockton, California )
) **2 1 7 - SW - 0 7 1 0 — EFB**
)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-3, attached hereto and incorporated by reference.**

## SEALED

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _8 – 21 – 2017_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   _8 – 7 – 2017_
_at 3:30pm –_

City and state:      Sacramento, California                  Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
              Signature of Judge                                              Date

## **Attachment A-3**

### **2138 Lonnie Beck Way, Stockton, California**

2138 Lonnie Beck Way, Stockton, California is a two-story residence located on the southeast corner of the intersection of Lonnie Beck Way and Spring Creek Place in Stockton, California. A photograph of the home's exterior is pasted below.

The residence is cream-colored stucco. A shrub brush line sits to the west of the residence, along Spring Creek Place. The residence has a dark-colored front door, which faces north. The black-colored numbers "2138" are displayed on the west side of a large garage door. The rear of the property is surrounded by a fence.

The search of this location shall include ANY AND ALL attachments, including attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.

This warrant also pertains to any vehicles located in the garage of 2138 Lonnie Beck Way.



## ATTACHMENT B

## ITEMS TO BE SEARCHED FOR AND SEIZED FROM THE PREMISES AND FROM ANY CLOSED ITEMS AND CONTAINERS FOUND THEREIN

Agents are authorized to search and seize property that constitutes evidence, fruits, proceeds, and instrumentalities of violations of the following federal statutes (the "Target Offense") believed to have been committed by Daniel Barraza-Bazua:

    a.  21 U.S.C. § 846 – Conspiracy to Distribute and to Possess with Intent to Distribute More than 50 Grams of Actual Methamphetamine

    b.  21 U.S.C. § 841(a)(1) – Distribution of More than 50 Grams of Actual Methamphetamine

As further described in the affidavit, the specific evidence, fruits, proceeds and instrumentalities of the Target Offenses for which agents may search includes:

1.    Any methamphetamine, illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2.    United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

3.    Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, all computer components which operate computers and which would reveal the receipt of proceeds from heroin or methamphetamine distribution and the transfer, investment, control and disposition of those proceeds;

4.    Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5.    Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

1

6.   Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.   Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.   Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

9.   Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

11.  Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12.  Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

13.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.